ORIGINAL

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

2006 APR 13  AM 8: 26

ROBERT DIXON,              )
                           )
        Plaintiff,         )
                           )
    v.                     )    CV 104-183
                           )
CHIEF TOOLE, et al.,       )
                           )
        Defendants.        )

CLERK _L. Ilbuden_
SO. DIST. OF GA.

O R D E R

The captioned matter is before the Court on Plaintiff's
motion for summary judgment (doc. no. 42) and Defendants'
cross-motion for summary judgment. Doc. no. 47. For the
reasons explained herein, Plaintiff's motion for summary
judgment is **DENIED**, and Defendants' motion for summary
judgment is **GRANTED**. The Clerk is **DIRECTED** to enter **FINAL
JUDGMENT** in favor of Defendants and to **CLOSE** the case.

I.   BACKGROUND

Plaintiff, a Georgia state inmate, brought the instant
complaint pursuant to 42 U.S.C. § 1983 on October 29, 2004.
Due to pleading deficiencies, the Court ordered Plaintiff to
amend his complaint. See doc. nos. 15 & 20. Although
Plaintiff refused to fully comply with the Court's
instructions regarding amending his complaint, the Court
nevertheless screened Plaintiff's complaint pursuant to 28
U.S.C. §§ 1915(e) and 1915A and allowed the case to proceed.
See doc. no. 22.

However, Plaintiff's case then took an unusual turn. On October 17, 2005, this Court received a copy of a letter Plaintiff had addressed to the "Chief Judge" of the United States District Court for the Northern District of Georgia. See Attachment, p. 3. In this letter, Plaintiff threatened: "If you don't stop trying to dismiss my case for no reason . . . I will have my boys in Atlanta kill you and your family. I am from the ATL [sic] and can get you dead with one phone call." Id. at 2. Plaintiff's letter mistakenly states that his case, "CV 104-183," was filed "in the United States District Court for the Northern District of Georgia[,] Augusta Division." Id.

After writing this apparent threat (and sending it to the wrong court), Plaintiff moved for summary judgment. Doc. no. 42. Plaintiff alleges that, while he was incarcerated at the Richmond County Jail ("the Jail") and the Charles B. Webster Detention Facility ("Webster") in Augusta, Georgia, Defendants subjected him to unconstitutional conditions of confinement. According to Plaintiff, Defendants: 1) exposed him to unsanitary, overcrowded conditions which ultimately caused him to contract Hepatitis C from an infected cell-mate, 2) wrongfully placed him in a stripped "observation cell" equipped with no plumbing except a hole in the floor and made him wear a paper gown, and 3) needlessly placed him in handcuffs and leg restraints for a seventeen-hour period.

2

Pl.'s Aff., pp. 1-3.

Of course, Defendants dispute Plaintiff's version of the events, offering the following evidence. Defendants are employees of the Richmond County Sheriff's Department, which operates both the Jail and Webster. Defendant Charles A. Toole, Sr. ("Toole") is the Chief Jailor and oversees all operations at both the Jail and Webster. Toole Aff., ¶ 2. Defendant Captain William E. Johnson ("Johnson") directly supervises operations at the Jail, while Defendant Captain Chester Huffman ("Huffman") is in charge of operations at Webster. Toole Aff., ¶ 2; Johnson Aff., ¶ 2; Huffman Aff., ¶ 2. Defendant Walter Etterlee ("Etterlee") is a deputy sheriff who works at Webster.[1]   Etterlee Aff., ¶ 2. Defendants Sergeant Walter Quick ("Quick"), Todd Kitchens ("Kitchens"), and Sergeant Taylor ("Taylor") are other officers who work at the Jail and Webster. See Huffman Aff., ¶ 6; Defs.' Ex. A; doc. no. 49, pp. 26-31.

According to Defendants, Plaintiff was booked into the

_____

[1]It should be noted that service of process has not been effected upon a number of Defendants due to Plaintiff's difficulty in providing the Marshal with their correct identities and locations. See, e.g., doc. no. 39. Plaintiff's concerns regarding service of process are the subject of two pending motions before the Court. See doc. nos. 37 & 40. Nevertheless, as the Court determines that Plaintiff's claims are devoid of merit and all Defendants are entitled to judgment as a matter of law, this issue is of no moment. Accordingly, Plaintiff's motions regarding the correct identities of these Defendants and effecting service of process upon them (doc. nos. 37 & 40) are **DENIED** as **MOOT**.

Jail on November 14, 2003.[2]   Johnson Aff., ¶ 3; <u>see also</u> Defs.' Ex. A.  On November 21, 2003, Plaintiff was transferred to Webster.   Johnson Aff., ¶ 4.   On December 10, 2003, Plaintiff wrote a note to Webster medical staff stating that he was suicidal; consequently, Plaintiff was transferred to the "special needs unit" of the Jail and placed in a "suicide cell."  Huffman Aff., ¶ 5; Johnson Aff., ¶ 5.

Suicide cells are stripped of any objects that an inmate could use to harm himself.  As a result, they are "totally devoid of any mattresses or bedding materials and do not contain a sink or a toilet."   Toole Aff., ¶ 3; <u>see also</u> Johnson Aff., ¶ 6.   A suicide cell does contain a raised platform where the inmate may sleep, as well as a hole in the middle of the floor of the cell where the inmate may relieve himself.  Toole Aff., ¶ 3.  Before being placed in a suicide cell, the inmate is stripped of any items he could use to harm himself, including clothing, and given a paper gown.   <u>Id.</u>

---

[2]As Defendants explain:

> [Plaintiff] had previously been convicted of possession of cocaine with intent to distribute and sentenced on August 22, 2003, to ten years [of] probation with some of the probation to be served at [a] Diversion Center. On November 14, 2003, when [Plaintiff] was booked into the Richmond County Jail, he was booked on charges of escape from the Diversion Center, probation violations, and new and additional traffic charges. [Plaintiff's] probation was eventually revoked, and he was re-sentenced to a term of confinement.

Johnson Aff., ¶ 3; <u>see also</u> Defs.' Ex. A.

4

Once placed in a suicide cell, the inmate cannot be returned to the Jail's general population without the express approval of the medical staff and Defendant Toole, the Chief Jailor. Id. ¶ 4.

While in the suicide cell, the inmate is subject to constant observation by jail guards, who flush the cell's hole every 30-40 minutes while conducting security checks. Johnson Aff., ¶ 6. For obvious reasons, inmates in suicide cells are kept "alone"--they do not have cell-mates. Id. However, this is not to say that inmates in the suicide cells do not have contact with other inmates. Other inmates in the special needs section are allowed to speak to the inmates the suicide cells, and also have access to the "button outside the cell" which jail guards use to flush the hole. Id.

Plaintiff's placement in a suicide cell lasted until December 12, 2003, when he was cleared for return to the general population at the Jail. Id. ¶ 7. On March 8, 2004, he was transferred back to Webster. Id. At this point, Plaintiff began to exhibit "bizarre, unusual, and violent behaviors" and became a constant discipline problem. Huffman Aff., ¶ 6; see also Defs.' Ex. B. On March 22, 2004, Plaintiff ignored Defendant Quick's instruction to get off the telephone and began "calling [Defendant] Quick obscene names." Johnson Aff., ¶ 6. As a result of this behavior, Plaintiff was put on "lockdown." Id.

5

That same day, while on lockdown, Plaintiff deliberately clogged his toilet with a cup and flooded his cell.  Id. ¶ 7; see also Defs.' Ex. B.  On the following day, Plaintiff "defecated on the floor in front of the cell door and then spread the feces on the cell window."  Huffman Aff., ¶ 8. Plaintiff also ate some the feces he had smeared on the window.  Id. ¶ 9.  When Defendant Etterlee opened Plaintiff's cell door, Plaintiff charged him and threw a food tray at him. Id.; see also Etterlee Aff., ¶ 3.  Several officers arrived on the scene and restrained Plaintiff in handcuffs and leg irons in order to restore order.  Etterlee Aff., ¶¶ 3-4; Huffman Aff., ¶8; Defs.' Exs. C & D.  Plaintiff was seen by medical staff and placed on "suicide watch" until he could be transferred to the special needs unit of the Jail.  While on "suicide watch" at Webster, guards kept watch on him in fifteen-minute intervals.  Huffman Aff., ¶ 9.

Plaintiff also remained in handcuffs and leg irons for the duration of his time on "suicide watch," although the restraints were removed periodically to allow Plaintiff to shower and to eat.  Id. at 12.  According to Defendants, these restraints were necessary for Plaintiff's own safety, as well the safety of Webster staff.[3]  All told, Plaintiff was restrained for a total period of between sixteen and twenty

_____

[3]Indeed, Defendants assert that, while restrained, Plaintiff was so agitated and violent that he actually bent his handcuffs. See Huffman Aff., ¶ 10; see also Defs.' Ex. F.

6

hours.  Id. ¶ 17; see also Defs.' Exs. G & H.

On the afternoon of March 24, 2004, Plaintiff was transferred to the Jail's special needs unit.  Huffman Aff., ¶¶ 13-14.  At this time, Plaintiff's restraints were removed.  Id. ¶ 16.  Upon Plaintiff's return to the special needs unit, Plaintiff was placed in an "observation cell," where he would remain until April 14, 2004, when he was cleared for return to the general population.  Toole Aff., ¶ 6; Johnson Aff., ¶ 8.  On April 15, 2004, Plaintiff was transferred to the custody of the Georgia Department of Corrections.  Johnson Aff., ¶ 9.

While in the observation cell, Plaintiff was subject at all times to direct observation by a booking officer.  Id. ¶ 8.  However, observation cells should not be confused with suicide cells.  The observation cells are considerably larger than the suicide cells, contain sinks and toilets, and are often used to house more than one inmate.  Id. Also of note, contrary to Plaintiff's averment that conditions in these cells are unsanitary, Defendants report that the observation cells are cleaned daily.  Toole Aff., ¶ 10.

Finally, Defendants dispute Plaintiff's allegation that he contracted Hepatitis C while incarcerated at the Jail or Webster.  In support of their contention, Defendants provide the affidavit of Dr. Michael Rogers ("Rogers"), a physician who treats inmates at Webster and the Jail.  See Rogers Aff.  In addition, Rogers is the medical director at Davisboro State

Prison in Davisboro, Georgia.  Id. ¶ 2.

According to Rogers, Plaintiff's contention that he contracted Hepatitis C through contact with another inmate is implausible.  Id. ¶ 6. Hepatitis C is a "blood-borne" virus, usually transmitted by use of a contaminated needle or via blood transfusion.  Id. ¶ 4.   Thus, Plaintiff's allegation that he contracted the disease through contact with an infected inmate (even one with a bleeding wound) is unlikely. Id. ¶ 6. Regardless, Rogers points out that in June 2004, while Plaintiff was incarcerated at Ware State Prison, Georgia Department of Corrections officials performed two separate blood tests on Plaintiff.  According to these tests, Plaintiff does not have Hepatitis C.   Id. ¶ 5; see also Rogers Ex. A (attached to Rogers Aff.).

Having summarized the relevant evidence, the Court resolves the matter follows.

## II.  DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Applicable substantive law identifies which facts are

material in a given case.[4]   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials on file, that there are no genuine issues of material fact to be decided at a trial.   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).   If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party."   United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).   On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929 F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).   Merely stating that the non-moving party cannot meet its burden at trial is not sufficient.   Clark, 929

---

[4]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important.  That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

F.2d at 608.  Evidence presented by the movant is viewed in the light most favorable to the non-moving party.  <u>Adickes</u>, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  <u>Clark</u>, 929 F.2d at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255 (quoting <u>Adickes</u>, 398 U.S. at 158-59).  A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> at 248.

### B.  Merits of Plaintiff's Claims

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."[5]  <u>Farmer v. Brennan</u>, 511 U.S.

---

[5]The Due Process Clause of the Fourteenth Amendment functions to provide pretrial detainees with essentially the same level of protection as that afforded convicted prisoners by the Eighth Amendment.  <u>See</u> <u>Cottrell v. Caldwell</u>, 85 F.3d

825, 832 (1994)(internal citation and quotation omitted).  As a result, prison officials may not subject inmates to "excessive physical force;" likewise, prison officials are obliged to provide prisoners with "adequate food, clothing, shelter, and medical care."  Id.

Mistreatment of a prisoner rises to the level of a constitutional violation only when officials act with "deliberate indifference"[6] to an "objectively, 'sufficiently serious'" deprivation--namely, a substantial risk of serious harm to the prisoner's health or safety.  Farmer, 511 U.S. at 834.  In the prison-conditions context, a deprivation does not take on constitutional dimension unless it "result[s] in the denial of the minimal civilized measure of life's necessities."  Id. (internal quotation omitted).  Similarly, the use of force becomes excessive only when it is applied maliciously and for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline.  Hudson v. McMillian, 503 U.S. 1, 7 (1992).

Here, Plaintiff alleges that Defendants subjected him to inhumane conditions of confinement, used excessive force

---

1480, 1490 (11th Cir. 1996); Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).  Thus, to the extent Plaintiff may argue that he was being held as a pretrial detainee, the same legal standard would apply.

[6]In order to act with the requisite intent of "deliberate indifference," prison officials must subjectively "know[] of and disregard[] an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.

against him, and acted with deliberate indifference to a serious risk to his health by exposing him to Hepatitis C. To begin, it should be noted that Plaintiff's claims for compensatory damages suffer from a fundamental problem. Plaintiff's complaint is subject to the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury while in custody without a prior showing of physical injury." 28 U.S.C. § 1997e(e); see also Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003).

Section 1997e(e)'s physical injury requirement applies to all federal actions brought by prisoners, even to the extent that the requirement may bar an otherwise cognizable claim of constitutional magnitude. Harris v. Garner, 190 F.3d 1279, 1287-88 (11th Cir. 1999), *vacated in part and reinstated in pertinent part on reh'g* 216 F.3d 970, 984-85 (11th Cir. 2000)(*en banc*). Although § 1997e(e) operates as a pleading requirement regarding what a prisoner must allege in order to bring suit, see Harris, 190 F.3d at 1286, it also imposes an evidentiary standard on prisoner claims for compensatory damages.[7] See Jarriett v. Wilson, 414 F.3d 634, 641 (6th Cir.

---

[7]Of course, § 1997e(e) does not impact prisoner claims for declaratory or injunctive relief, as well as nominal damages. See Harris, 190 F.3d at 1288. That said, because Plaintiff is no longer incarcerated at the Jail or Webster, any claim for injunctive or declaratory relief is **MOOT**, and Plaintiff has not requested

12

2005); <u>Royal v. Kautzky</u>, 375 F.3d 720, 722 (8th Cir. 2004);
<u>Alexander v. Tippah County, Miss.</u>, 351 F.3d 626, 631 (5th Cir.
2003); <u>Searles v. Van Bebber</u>, 251 F.3d 869, 877 (10th Cir.
2001). In order for a claim to survive § 1997e(e), a prisoner
must present evidence to support a finding that he has
suffered an actual physical injury that is more than *de
minimis*. <u>Harris</u>, 190 F.3d at 1287.

Here, Plaintiff has presented no proof that he ever
actually suffered any physical injury (as opposed to
discomfort). Accordingly, it is clear that Plaintiff's claims
for compensatory damages cannot surmount the § 1997e(e) bar.
Regardless, the Court is persuaded that none of Plaintiff's
claims survive Defendants' motion for summary judgment.

First, Plaintiff's claim that Defendants' deliberate
indifference to a risk to his health caused him to contract
Hepatitis C is patently false. Plaintiff has not shown that
he ever faced a substantial risk of contracting the disease,
much less that Defendants acted with deliberate indifference
to any such risk. The issue simply does not merit further
discussion.

Nor is the Court persuaded that Plaintiff's involuntary
stints in suicide and observation cells violated his
constitutional rights. Although his time in these cells,

---

nominal damages.

especially his two-day stay in the stripped suicide cell, was doubtless uncomfortable, no constitutional deprivation resulted. <u>See, e.g.</u>, <u>Williams v. Delo</u>, 49 F.3d 442, 445-46 (8th Cir. 1995). Taking into account the circumstances of Plaintiff's case, it is clear that Plaintiff was never denied "the minimal civilized measure of life's necessities."[8]

There is no evidence that Plaintiff was ever deprived of medical care, food, or shelter from the elements. <u>See id.</u> at 445-46. Moreover, the record reflects that Plaintiff's stints in the suicide and observation cells were based upon Defendants' proper decision "that he posed a risk to institutional security and was a danger to himself and others." <u>Id.</u> Given these facts, no reasonable juror could conclude that Defendants acted in conscious disregard of a serious risk to Plaintiff's health or safety--indeed, the evidence tends to the opposite conclusion.[9] Simply put,

---

[8]To the extent Plaintiff may argue that he had an absolute to clothing or bedding, no such right exists. <u>Williams</u>, 49 F.3d at 446. Likewise, prison officials do not act unconstitutionally by temporarily denying a violent or suicidal inmate access to a sink or toilet. <u>See, e.g.</u>, <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1314-15 (9th Cir. 1995). More generally, it should also be noted that short periods of incarceration in unsanitary conditions are generally insufficient to evidence an Eighth Amendment violation. <u>See, e.g.</u>, <u>Harris v. Fleming</u>, 839 F.2d 1232, 1235 (7th Cir. 1988)(depriving prisoner of toilet paper, soap, toothpaste and toothbrush while keeping him in filthy, roach-infested cell for a period of several days was not a constitutional violation).

[9]Nor may Plaintiff successfully argue that his placement in the suicide cell or the observation cell was sadistic or malicious, absent some proof that Defendants acted in bad faith. <u>See generally</u>, <u>Sims v. Mashburn</u>, 25 F.3d 980 (11th Cir. 1994).

14

Plaintiff has not shown that his placement in suicide and observation cells put him in any danger or caused him to suffer more than temporary discomfort, much less that Defendants acted with "deliberate indifference" to his health or safety.  As a result, his claims regarding his stints in the stripped suicide cell and the observation cell fail as a matter of law.[10]

Next, Plaintiff's excessive force claims also fail. In deciding whether the use of force is excessive, the Court considers: 1) the extent of any injury inflicted as a result of the force used, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) whether any efforts were made to temper the severity of a forceful response,  and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by Defendants on the basis of facts known to them.  Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). Also of note, "courts should afford great deference to prison officials regarding the use of restraints as a prophylactic or preventive measure."  Id.

---

[10]Plaintiff's general allegations of overcrowded and unsanitary conditions fail for the same reasons.  Plaintiff has offered no evidence showing that overcrowding at the Jail or Webster deprived him of "the minimal civilized measure of life's necessities."  See Hamm, 774 F.2d at 1575 ("In assessing claims of unconstitutionally overcrowded jails, courts must consider the impact of the alleged overpopulation on the jail's ability to provide such necessities as food, medical care, and sanitation.").

Here, the evidence does not support Plaintiff's contention that Defendants' use of force was excessive. First, there is no evidence that Plaintiff suffered more than *de minimis* injury as a result of Defendants' actions in subduing and restraining him. Second, it is hard to square Plaintiff's contention that Defendants acted maliciously and sadistically with the fact that he was put on "suicide watch" and monitored every fifteen minutes. See Campbell, 169 F.3d at 1375-76. Next, the need for the application of force was clear--Plaintiff posed an obvious threat to himself and others. Finally, although Plaintiff may argue that the restraints were applied after the need for them had ceased, the Court finds any such argument unpersuasive. It is not enough to present evidence raising "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives;" in order to prevail on his claims, Plaintiff must present evidence supporting the inference that Defendants acted "maliciously and sadistically for the very purpose of causing harm." Id. at 1377.

Of note, the Eleventh Circuit has upheld the use of far more restrictive measures in controlling violent or suicidal inmates. In Williams v. Burton, 943 F.2d 1572, 1574 (11th Cir. 1991), the Eleventh Circuit held that prison officials' use of four-point restraints and a gag for twenty-eight and one-half hours in order to control a violent inmate did not

16

constitute excessive force.  In <u>Campbell</u>, cited *supra*, prison officials put a suicidal inmate in an "'L' shaped restraint" for over sixty-six hours; the Eleventh Circuit determined that the use of force was not excessive.  169 F.3d at 1376.  Here, Defendants took far less drastic action and made efforts to temper the severity of their response to Plaintiff's outburst. Put plainly, Plaintiff's excessive force claim is devoid of merit.

In sum, Defendants have demonstrated their entitlement to summary judgment.  Nevertheless, although the Court has resolved this case on its merits, Plaintiff's *ex parte* letter threatening the lives of the undersigned and his family should not be allowed to pass without comment.  In addition to impugning the integrity of the Court by accusing it of "wanting to deny [Plaintiff] due justice," <u>see</u> Attachment, p. 1, Plaintiff has launched "a veritable attack on our system of justice" by threatening a federal judge and his family. <u>Jimenez v. Madison Area Technical College</u>, 321 F.3d 652, 657 (7th Cir. 2003)(affirming dismissal of complaint for fraudulent conduct).

"Such writings are intolerable, and [the Court] will not tolerate them." <u>Garrett v. Selby Connor Maddux & Janer</u>, 425 F.3d 836, 841 (10th Cir. 2005); <u>see also</u> <u>In re Mann</u>, 229 F.3d 657, 659 (7th Cir. 2000)("Litigants are understandably disappointed when they do not prevail in court, but that does

17

not give them the license to attack the integrity of the
judiciary. Such abusive conduct will not be tolerated, not
even from a *pro se* litigant."). As the former Fifth Circuit
aptly expressed:

> This court simply will not allow liberal pleading
> rules and *pro se* practice to be a vehicle for
> abusive documents. Our *pro se* practice is a shield
> against the technical requirements of a past age;
> it is not a sword with which to insult a trial
> judge.

Theriault v. Silber, 579 F.2d 302, 303 (5th Cir. 1978)(*per
curiam*).

Simply put, in addition to likely constituting a crime,
see 18 U.S.C. § 115(a)(1)(B), Plaintiff's abusive conduct
"disentitles [him] to call upon the resources of the Court for
determination of his claims." Molinaro v. New Jersey, 396 U.S.
365, 366 (1970)(*per curiam*)(holding that convicted defendant's
escape warranted dismissal of his appeal); see also Garrett v.
Selby Connor Maddux & Janer, 425 F.3d 836, 841 (10th Cir.
2005)(dismissing appeal brought as an "attempt to impugn
(without basis) the integrity of the district judge."). 
Plaintiff cannot clamor for justice while using the same
breath to threaten the trial judge.  Consequently, the Court
also determines that it is appropriate to grant Defendants'
motion for summary judgment as a sanction for Plaintiff's
conduct, irrespective of the merits of the case.

"It has long been understood that '[c]ertain implied

18

powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)(quoting United States v. Hudson, 1 U.S. 32, 34 (1812)). Accordingly, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution." Anderson v Dunn, 19 U.S. 204, 227 (1821). Of course, "[b]ecause of their potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44.

Nevertheless, the Court's inherent power "is organic, without need of a statute or rule for its definition." United States v. Shaffer Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993). Thus, it is broad and flexible enough to "reach[] both conduct before the court and that beyond the court's confines" that abuses the judicial process. Chambers, 501 U.S. at 44. More to the point, it includes the power to dismiss a case with prejudice in order "to protect [the Court's] integrity and punish litigants for gross misconduct." Greviskes v. Universities Research Ass'n, Inc., 417 F.3d 752, 755 (7th Cir. 2005)(quoting Greviskes v. Universities Research Ass'n, Inc.,

19

226 F.R.D. 595, 596 (N.D. Ill. 2004)).   Such action is appropriate in this case.

## III. CONCLUSION

For all of the above reasons, Plaintiff's motion for summary judgment is **DENIED**, and Defendants' motion for summary judgment is **GRANTED**.   All other pending motions are **DENIED** as **MOOT**.   The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants and to **CLOSE** the case.

SO ORDERED this 13th day of April, 2006, at Augusta, Georgia.

UNITED STATES DISTRICT JUDGE